# IN THE SUPREME COURT OF IOWA

No. 18–1856

Filed June 14, 2019

**GREGORY BALDWIN,**

Appellant,

vs.

**CITY OF ESTHERVILLE, IOWA,**

Appellee.

Certified questions of law from the United States District Court for the Northern District of Iowa, Mark W. Bennett, United States District Court Judge.

The United States District Court for the Northern District of Iowa certifies six questions pursuant to Iowa Code § 684A.1 (2019). **CERTIFIED QUESTIONS ANSWERED.**

Jack Bjornstad, Spirit Lake, for appellant.

Douglas L. Phillips and Zachary D. Clausen of Klass Law Firm, LLP, Sioux City, for appellee.

Thomas J. Miller, Attorney General, Jeffrey S. Thompson, Solicitor General, and Julia S. Kim, Assistant Attorney General, for amicus curiae State of Iowa.

Katie Ervin Carlson and Emily McCarty of Timmer & Judkins, P.L.L.C., West Des Moines, and Joel E. Fenton of Law Offices of Joel E. Fenton, PLC, Des Moines, for amicus curiae Iowa Association for Justice.

Jason C. Palmer, Thomas M. Boes, Catherine M. Lucas, and Benjamin R. Erickson, Des Moines, for amicus curiae Iowa Communities Assurance Pool.

**WIGGINS, Justice.**

The United States District Court for the Northern District of Iowa certifies six questions pursuant to Iowa Code section 684A.1 (2019). In our discretion, we answer five of the questions because they meet the criteria of section 684A.1. We do not answer one of the questions because it does not meet the criteria of section 684A.1.

## I. Facts Provided to Answer Certified Questions.

"When we answer a certified question, we rely upon the facts provided with the certified question." *Baldwin v. City of Estherville* (*Baldwin II*), 915 N.W.2d 259, 261 (Iowa 2018); *accord Life Inv'rs Ins. Co. of Am. v. Estate of Corrado*, 838 N.W.2d 640, 644 (Iowa 2013) ("[W]e restrict our answer to the facts provided by the certifying court when answering a certified question."). The facts as set forth by the federal court are as follows:

> The factual background to this case is set out in considerable detail in [the federal court's] prior ruling on cross-motions for summary judgment, *see Baldwin v. Estherville, Iowa* [(*Baldwin I*)], 218 F. Supp. 3d 987, 989–93 (N.D. Iowa 2016), then by the Iowa Supreme Court in *Baldwin* [*II*], 915 N.W.2d 259, 261–65 (Iowa 2018). For present purposes, suffice it to say that, on November 10, 2013, Officers Reineke and Hellickson, of the Estherville City Police, were shown a video by a resident in the Estherville area of a person the officers identified as plaintiff Gregory Baldwin riding a 4-wheeler ATV that proceeded along North 4th Street and turned into a ditch, using the north Joe Hoye Park entrance, after which it continued in the ditch until it reached West 14th Avenue North, where it returned to the roadway.

> The officers then reviewed IOWA CODE CH. 321I [(2014)], which, *inter alia*, permitted operation of ATVs only on streets designated by cities, *see* IOWA CODE § 321I.10(3), because the officers believed that Chapter 321I had been incorporated by reference into the City's Code of Ordinances when Chapter 321 was incorporated. They also consulted *The Handbook of Iowa All–Terrain Vehicle and Off–Highway Motorcycle Regulations* (*Handbook*), which the defendants contended is a handbook frequently relied upon by police officers when determining whether off-road vehicles are operating in

compliance with applicable laws. Finally, they discussed the matter with the City's police chief and a police captain. They concluded that the activity shown in the video amounted to a violation of City Ordinance E-321I.10. However, that Ordinance was not valid or in effect at the time, because it did not exist.

Officer Reineke prepared a citation and attempted to serve it on Baldwin at his home, but he was not there. Officer Reineke then refiled the citation with the notation "Request Warrant." On November 12, 2013, a state magistrate entered an order directing that a warrant issue. On November 13, 2013, Officer Hellickson served the warrant on Baldwin and took him to jail. Baldwin's wife posted bond, and Baldwin later pleaded not guilty to the charge.

In the days that followed, the City Attorney discovered that the City had not included IOWA CODE CH. 321I when it incorporated IOWA CODE CH. 321 into the City's Code of Ordinances. The City Attorney was granted leave to amend the charge to allege a violation of a different ordinance, City Ordinance 219–2(2). City Ordinance 219–2 generally permits ATVs to be operated on City streets except where prohibited, but subsection (2) prohibits operation of ATVs "in city parks, playgrounds, or upon any publicly-owned property." On Baldwin's Motion For Adjudication Of Law Points And To Dismiss, the Iowa District Court found that the cited act was not a violation of the City's Code of Ordinances as written and dismissed the case. The state court did so only after making two key constructions of pertinent City Ordinances: (1) that the plain meaning of "street" in City Ordinances included the "ditch," and (2) that "publicly-owned property" in City Ordinance 219–2(2), to the extent that it conflicted with another ordinance defining "street," did not include the "ditch" of a City street. *See Baldwin* [*I*], 218 F. Supp. 3d at 1000–1001.

*Baldwin v. Estherville* (*Baldwin III*), 333 F. Supp. 3d 817, 823–24 (N.D. Iowa 2018); *see Baldwin v. Estherville* (*Baldwin IV*), 336 F. Supp. 3d 948, 950 (N.D. Iowa 2018) (order certifying questions) (incorporating by reference the factual statements made in *Baldwin I*, 218 F. Supp. 3d at 989–93, *Baldwin II*, 915 N.W.2d at 261–65, and *Baldwin III*, 333 F. Supp. 3d at 822–24). We will refer to the City of Estherville as the "City" in this opinion.

## II. Questions Certified by the Federal Court.

In *Baldwin II*, we answered a certified question from the federal court involving qualified immunity. 915 N.W.2d at 260–61, 281. There we said,

> Constitutional torts are torts, not generally strict liability cases. Accordingly, with respect to a damage claim under article I, sections 1 and 8 [of the Iowa Constitution], a government official whose conduct is being challenged will not be subject to damages liability if she or he pleads and proves as an affirmative defense that she or he exercised all due care to conform to the requirements of the law.

*Id.* at 281.

It is not clear whether *Baldwin II* addressed whether qualified immunity is available to government employers. *See id.*; *id.* at 281–83 (Appel, J., dissenting); *see also Baldwin III*, 333 F. Supp. 3d at 831–32. Because the only defendant in this case is a municipality, the federal court has asked additional certified questions. On October 2, the federal court issued an order certifying the following six questions to this court:

> 1. Can the City assert qualified immunity to a claim for damages for violation of the Iowa Constitution based on its officers' exercise of "all due care"?

> 2. If the City can assert such a defense, on the facts presented in this case, does the City have "all due care" qualified immunity to liability for damages for the violation of Baldwin's right to be free from an unreasonable search and seizure under article I of the Iowa Constitution? This question necessarily includes questions about the extent to which reliance on a warrant may satisfy the "all due care" standard and whether the "all due care" analysis considers alternative bases for probable cause or a warrant on which the officers did not rely.

> 3. If punitive damages are an available remedy against an individual defendant for a violation of a plaintiff's rights under the Iowa Constitution, can punitive damages be awarded against a municipality that employed the individual defendant and, if so, under what standard?

> 4. If punitive damages are available in answer to the previous question, would a reasonable jury be able to find that

the applicable standard was met on the facts presented in this case?

     5. If an award of attorney's fees would have been available against an individual defendant for a plaintiff who attains some degree of success on a claim of a violation of a plaintiff's rights under the Iowa Constitution, would they be available against a municipality that employed the individual defendant and, if so, under what standard?

     6. If the answer to either Question No. 3 or Question No. 5 (or both) is in the affirmative, will retroactive application to the pending case be appropriate?

*Baldwin IV*, 336 F. Supp. 3d at 958–59.

**III. Standard of Review and Criteria for Answering Certified Questions.**

The statutory provision authorizing us to answer a certified question provides,

> The supreme court may answer questions of law certified to it by . . . a United States district court . . . , when requested by the certifying court, if there are involved in a proceeding before it questions of law of this state which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the appellate courts of this state.

Iowa Code § 684A.1 (2019). Thus, the Code gives us the discretion to answer a certified question if four conditions are met:

> (1) a proper court certified the question, (2) the question involves a matter of Iowa law, (3) the question "may be determinative of the cause . . . pending in the certifying court," and (4) it appears to the certifying court that there is no controlling Iowa precedent.

*Life Inv'rs Ins. Co. of Am.*, 838 N.W.2d at 643 (alteration in original) (quoting Iowa Code § 648A.1 (2013)).

**IV. Certified Question Number 1: A Municipality's Ability to Assert Qualified Immunity Based on Its Officers' Exercise of "All Due Care."**

The first certified question from the federal district court is "Can the City assert qualified immunity to a claim for damages for violation of the Iowa Constitution based on its officers' exercise of 'all due care'?" *Baldwin IV*, 336 F. Supp. 3d at 958. This question essentially asks whether a municipality can be "vicariously immune" from liability for its employees' constitutional torts when the employees would be immune from personal liability. The question does not ask whether a municipality is immune for its own acts.

Baldwin bases his suit against the City on a constitutional tort and the doctrine of respondeat superior. We recognized that a direct cause of action for damages resulting from an Iowa constitutional tort could be brought against the state and state officials in their official capacities in the recent case of *Godfrey v. State.* 898 N.W.2d 844, 847 (Iowa 2017). Before answering the first certified question, we must determine whether the Iowa Municipal Tort Claims Act (IMTCA) applies to a *Godfrey* action brought against the municipal employer of the constitutional tortfeasor.[1]

A *Godfrey* action is the state counterpart to a *Bivens* action. *See id.* A *Bivens* action is a claim brought in federal court against a federal agent to recover damages from the agent's commission of a Federal constitutional tort. *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 397, 91 S. Ct. 1999, 2005 (1971). The creation of a *Bivens* action by the United States Supreme Court and our

---

[1]In his petition, which was filed before our decision in *Godfrey*, Baldwin stated that his suit challenging the violation of his constitutional rights was brought under the Iowa Constitution and that his causes of action regarding the violation of his Iowa constitutional rights were brought pursuant to Iowa Code chapter 670, the IMTCA. However, in his court filings subsequent to our *Godfrey* decision, Baldwin only contends his Iowa constitutional claims were brought directly under the Iowa Constitution.

creation of a *Godfrey* action are consistent with section 874A of the Restatement (Second) of Torts. Section 874A provides,

> When a legislative provision protects a class of persons by proscribing or requiring certain conduct but does not provide a civil remedy for the violation, the court may, if it determines that the remedy is appropriate in furtherance of the purpose of the legislation and needed to assure the effectiveness of the provision, accord to an injured member of the class a right of action, using a suitable existing tort action or a new cause of action analogous to an existing tort action.

Restatement (Second) of Torts § 874A, at 301 (Am. Law Inst. 1979); *see id.* § 874A cmt. *a,* at 301 (noting "legislative provision" includes constitutional provisions).

Illustration 1 under comment *f* to section 874A states, "The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. The court may grant a federal civil remedy in the nature of trespass against a federal officer who makes an unreasonable search of the plaintiff's home." *Id.* § 874A cmt. *f,* illus. 1, at 305. The authors of the Restatement took this illustration from *Bivens. Id.* § 874A Reporter's Note cmt. *f,* app. at 105.

Comment *f* further provides,

> *Relationship to other torts.* If, in a particular case, the court determines that it is appropriate to provide a civil action in order to effectuate the policy behind a legislative provision, that civil action will normally sound in tort. A tort action is the form of civil relief that grants damages or injunctive relief for harm wrongfully inflicted upon or threatened to an interest of the injured party. The cause of action will ordinarily be assimilated to the most similar common law tort. Common law torts were created by the courts, and they are still subject to being modified by the courts. If a legislative provision indicates the existence of a significant public policy within the jurisdiction, the courts, in furtherance of that policy, may judicially make modifications in the elements of a common law tort. Sometimes the judicial modification of an established tort comes in regard to the defenses applicable to it. A legislative policy against immunity for a certain type of defendant or against barring a criminal prosecution because

> of consent of a certain type of plaintiff, for example, may be the occasion for the court to change the scope or availability of the defense in a tort action.

*Id.* § 874A cmt. *f*, at 304–05 (citation omitted).

The United States Supreme Court applied these principles when it determined the Federal Tort Claims Act (FTCA) did not preempt a *Bivens* action even though the underlying facts of the case could also support a claim against the federal government under the FTCA. *Carlson v. Green*, 446 U.S. 14, 18–19, 100 S. Ct. 1468, 1471–72 (1980). The Court acknowledged that a *Bivens* action may be defeated when the defendant– federal official shows "that Congress has provided an alternative remedy which it explicitly declared to be a *substitute* for recovery directly under the Constitution and viewed as equally effective." *Id.* at 18–19, 100 S. Ct. at 1471. It found Congress did not intend to make the FTCA the exclusive remedy for federal actors' constitutional torts. *Id.* at 19–20, 100 S. Ct. at 1472. We cannot say the same for the IMTCA.

The Iowa legislature enacted the IMTCA in 1967. 1967 Iowa Acts ch. 405 (codified at Iowa Code ch. 613A (1971)). The IMTCA imposed liability on municipalities for their own and their employees' torts:

> Except as otherwise provided in this Act, every municipality is subject to liability for its torts and those of its officers, employees, and agents acting within the scope of their employment or duties, whether arising out of a governmental or proprietary function.

*Id.* § 2 (codified at Iowa Code § 613A.2).[2] It originally defined *tort* as "every civil wrong which results in wrongful death or injury to person or injury to property and includes but is not restricted to actions based upon

---

[2]This provision is currently codified at Iowa Code section 670.2(1) (2019) and is substantially the same as when enacted except the word *agents* has been removed.

negligence, breach of duty, and nuisance." *Id.* § 1 (codified at Iowa Code § 613A.1(3)).

In 1974, the legislature amended section 613A.1. 1974 Iowa Acts ch. 1263, §§ 1–2 (codified at Iowa Code § 613A.1(3) (1975)). In doing so, the legislature expanded the definition of *tort* to include violations of constitutional provisions. *Id.* § 2. The new language, which is the same as in the current Code, states,

> "*Tort*" means every civil wrong which results in wrongful death or injury to person or injury to property or injury to personal or property rights and *includes* but is not restricted to *actions based upon* negligence; error or omission; nuisance; breach of duty, whether statutory or other duty or *denial or impairment of any right under any constitutional provision*, statute or rule of law.

Iowa Code § 670.1(4) (2019) (emphasis added).

The IMTCA expressly dictates immunities for defendant municipalities. Iowa Code § 670.4(1); *see Jahnke v. Inc. City of Des Moines*, 191 N.W.2d 780, 782 (Iowa 1971) (noting the IMTCA eliminated any common law immunities in tort previously given to municipalities). In relevant part, the IMTCA immunizes municipalities against "[a]ny claim based upon an act or omission of an officer or employee of the municipality, exercising due care, in the execution of a statute, ordinance, or regulation whether the statute, ordinance or regulation is valid." Iowa Code § 670.4(1)(*c*). If the officers exercised due care in executing an ordinance, the City would be immune pursuant to section 670.4(1)(*c*).

Therefore, the answer to certified question number 1 is that the due care exemption under section 670.4(1)(*c*) could provide the City immunity.

**V. Certified Question Number 2: If a Municipality Can Assert Qualified Immunity Based on Its Officers' Exercise of "All Due Care," the City's Ability to Do So Under the Facts of This Case.**

The second certified question from the federal district court is

If the City can assert such a defense [(i.e., qualified immunity based on its officers' exercise of "all due care")], on the facts presented in this case, does the City have "all due care" qualified immunity to liability for damages for the violation of Baldwin's right to be free from an unreasonable search and seizure under article I of the Iowa Constitution? This question necessarily includes questions about the extent to which reliance on a warrant may satisfy the "all due care" standard and whether the "all due care" analysis considers alternative bases for probable cause or a warrant on which the officers did not rely.

*Baldwin IV*, 336 F. Supp. 3d at 958.

Under Iowa law, we have the discretion to answer a certified question if the question complies with the requirements of section 684A.1. One of the requirements under section 684A.1 is that the question involves a matter of law. *Life Inv'rs Ins. Co. of Am.*, 838 N.W.2d at 643. This question as posed requires us to apply the facts of this case to the answer to certified question number 1. Therefore, we decline to answer certified question number 2.

**VI. Certified Question Number 3: Award of Punitive Damages Against the Municipal Employer of the Constitutional Tortfeasor.**

The third certified question from the federal district court is

If punitive damages are an available remedy against an individual defendant for a violation of a plaintiff's rights under the Iowa Constitution, can punitive damages be awarded against a municipality that employed the individual defendant and, if so, under what standard?

*Baldwin IV*, 336 F. Supp. 3d at 958.

We have decided the IMTCA applies to Baldwin's Iowa constitutional tort causes of action. When the legislature enacted the IMTCA, it did not expressly prohibit a punitive damage award against a municipality. *See*

1967 Iowa Acts ch. 405. In 1978, we concluded the IMTCA did not prohibit punitive damages against the municipality that was sued for its police officers' commission of the common law tort of false arrest. *Young v. City of Des Moines*, 262 N.W.2d 612, 614, 622 (Iowa 1978) (en banc), *superseded by statute*, 1982 Iowa Acts ch. 1018, § 5 (codified at Iowa Code § 613A.4(5) (1983) (now § 670.4(1)(*e*))), *as recognized in Parks v. City of Marshalltown*, 440 N.W.2d 377, 379 (Iowa 1989). In response to *Young*, the legislature amended the IMTCA to exempt municipalities from punitive damages liability. *Parks*, 440 N.W.2d at 379; *see* S.F. 474, 69th G.A., 1st Sess., Explanation (Iowa 1981).

Therefore, the answer to certified question number 3 is that section 670.4(1)(*e*) precludes an award of punitive damages against the municipality that employed the constitutional tortfeasor.

**VII.  Certified Question Number 4: Punitive Damages Under the Facts of This Case.**

The fourth certified question from the federal district court is "If punitive damages are available in answer to the previous question, would a reasonable jury be able to find that the applicable standard was met on the facts presented in this case?" *Baldwin IV*, 336 F. Supp. 3d at 958. Because we hold no punitive damages are available against the municipal employer of the constitutional tortfeasor under the IMTCA, we need not answer this question.

**VIII. Certified Question Number 5: Award of Attorney Fees Against the Municipal Employer of the Constitutional Tortfeasor.**

The fifth certified question from the federal district court is

If an award of attorney's fees would have been available against an individual defendant for a plaintiff who attains some degree of success on a claim of a violation of a plaintiff's rights under the Iowa Constitution, would they be available

against a municipality that employed the individual defendant and, if so, under what standard?

*Id.* at 958–59.

Ordinarily, under the American rule each party is responsible for their own attorney fees and costs. *De Stefano v. Apts. Downtown, Inc.*, 879 N.W.2d 155, 168 (Iowa 2016). There are exceptions to the rule. One of these exceptions shifts the attorney fees of the victor to the losing party if there is an express statutory authorization to do so. *See Lee v. State*, 906 N.W.2d 186, 197 (Iowa 2018). Another exception is an award of common law attorney fees under very limited circumstances. *Williams v. Van Sickel*, 659 N.W.2d 572, 579 (Iowa 2003). In following the guidance of the Restatement (Second) of Torts, these are the only two situations where attorney fees can be shifted to the losing party in a *Godfrey* action. *See* Restatement (Second) of Torts § 914(1) & cmt. *a*, at 492 (noting exceptions to American rule on attorney fees).

In a *Godfrey* claim, like in a *Bivens* claim, there is no express statutory authorization for attorney fees. *Cf., e.g.*, Alexander A. Reinert, *Measuring the Success of* Bivens *Litigation and Its Consequences for the Individual Liability Model*, 62 Stan. L. Rev. 809, 811 n.6 (2010) (citing *Kreines v. United States*, 33 F.3d 1105 (9th Cir. 1994)) (noting there is no statutory provision that allows for attorney fees in a *Bivens* claim, unlike 42 U.S.C. § 1988, which allows for attorney fees in a § 1983 claim). Baldwin contends that 42 U.S.C. § 1988, Iowa Code section 669.15, and Iowa Code chapter 216 authorize attorney fees to the prevailing plaintiff in a *Godfrey* claim against a municipality. This position is untenable because none of those provisions extend to his cause of action.

Section 1988 allows attorney fees

[i]n any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, title IX

> of Public Law 92-318, the Religious Freedom Restoration Act
> of 1993, the Religious Land Use and Institutionalized Persons
> Act of 2000, title VI of the Civil Rights Act of 1964, or section
> 12361 of Title 34.

42 U.S.C. § 1988(b) (2012). Neither a generic *Godfrey* action brought against a municipality nor Baldwin's particular claim against the City is one of those.

Iowa Code section 669.15 is found in chapter 669, the Iowa Tort Claims Act. The Iowa Tort Claims Act does not cover suits against municipalities. Iowa Code § 669.2(3) (2019). Therefore, section 669.15 does not apply to either a generic *Godfrey* claim brought against a municipality or Baldwin's particular claim against the City.

Finally, Iowa Code section 216.15(9)(*a*)(8) allows the civil rights commission to order payment of attorney fees if it determines the defendant engaged in discriminatory or unfair practices. This is not a civil rights case under chapter 216. Thus, we do not find an express statutory provision for attorney fees.

But there is also a rare exception to the American rule on attorney fees "when the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Remer v. Bd. of Med. Exam'rs*, 576 N.W.2d 598, 603 (Iowa 1998) (en banc) (quoting *Hockenberg Equip. Co. v. Hockenberg's Equip. & Supply Co. of Des Moines, Inc.*, 510 N.W.2d 153, 158 (Iowa 1993)); *accord Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258–59, 95 S. Ct. 1612, 1622 (1975). Under those circumstances, a court may award attorney fees. *Id.* It will be up to the trial court to determine if Baldwin can meet the common law standard. *See Hockenberg Equip. Co.*, 510 N.W.2d at 159.

Therefore, the answer to certified question number 5 is that in a *Godfrey* action, a court cannot award attorney fees against the municipal

employer of the constitutional tortfeasor unless there is a statute expressly allowing such an award. We find none here. As for the common law rule regarding awarding attorney fees to the victorious party, it will be up to the trial court to determine if Baldwin has met the common law standard. *See id.* at 159–60 (setting forth standard for common law attorney fees).

**IX. Certified Question Number 6: Retroactive Application of Answers to Certified Questions on Punitive Damages and Attorney Fees.**

The sixth certified question from the federal district court is "If the answer to either Question No. 3 or Question No. 5 (or both) is in the affirmative, will retroactive application to the pending case be appropriate?" *Baldwin IV*, 336 F. Supp. 3d at 959.

Because we conclude the IMTCA prohibits an award of punitive damages against the municipal employer of the constitutional tortfeasor, we need not answer this question with respect to punitive damages. However, because we conclude common law attorney fees may be available in a *Godfrey* action against the municipal employer of the constitutional tortfeasor, we will proceed to answer this question with respect to common law attorney fees.

The City cites *Beeck v. S.R. Smith Co.*, 359 N.W.2d 482 (Iowa 1984), for the proposition that if we conclude attorney fees may be awarded against the municipal employer, that conclusion should not apply retroactively. *Beeck* involved a certified question from a federal court asking whether a minor's newly established *cause of action* for loss of parental consortium should be given retroactive effect. *Id.* at 484. The case did not involve a question of whether the availability of attorney fees in a cause of action should be given retroactive effect.

However, even if we apply the *Beeck* test, the possibility of common law attorney fees is available to Baldwin. In *Beeck,* we adopted a three-factor test for determining retroactivity of a cause of action. *Id.* The test we enumerated was,

> First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied or by deciding an issue of first impression whose resolution was not clearly foreshadowed. Second, it has been stressed that "we must . . . weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." Finally, we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity."

*Id.* (alterations in original) (citations omitted) (quoting *Chevron Oil Co. v. Hudson,* 404 U.S. 97, 106–07, 92 S. Ct. 349, 355 (1971), *abrogated in part by Harper v. Va. Dep't of Taxation,* 509 U.S. 86, 96–97, 113 S. Ct. 2510, 2517 (1993)).

We have allowed common law attorney fees in tort actions for over 100 years. *E.g., Dorris v. Miller,* 105 Iowa 564, 568, 75 N.W. 482, 483 (1898) (holding if the defendant's acts are "tainted by fraud, malice, or insult," the jury may award punitive damages and, in so doing, may include attorney fees in its award (quoting Theodore Sedgwick, *A Treatise on the Measure of Damages* 105 (Arthur G. Sedgwick ed., New York, Baker, Voorhis & Co., 5th ed. 1869), https://babel.hathitrust.org/cgi/pt?id=uc2.ark:/13960/t0cv4mr8h;view=1up;seq=7 [https://hdl.handle.net/2027/uc2.ark:/13960/t0cv4mr8h])), *superseded by statute,* 1986 Iowa Acts ch. 1211, § 42 (codified as amended at Iowa Code § 668A.1), *as recognized in Hockenberg Equip. Co.,* 510 N.W.2d at 159.

Application of the *Beeck* factors reveals fairness does not require only prospective application of our conclusion that in a *Godfrey* action, common law attorney fees may be available against the municipal employer of the constitutional tortfeasor. *See* 359 N.W.2d at 484. We are not creating a new principle of law by allowing common law attorney fees. Rather, we are applying time-honored tort principles. Common law attorney fees are to compensate a party when the opposing side "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Remer*, 576 N.W.2d at 603 (quoting *Hockenberg Equip. Co.*, 510 N.W.2d at 158). We see no reason not to allow common law attorney fees in this tort action.

Therefore, the answer to certified question number 6 is that it is appropriate to retroactively apply our conclusion that in a *Godfrey* action, common law attorney fees may be available against the municipal employer of the constitutional tortfeasor. Thus, Baldwin can receive an award of common law attorney fees in this action against the City if he can meet the standard for common law attorney fees.

**X. Disposition.**

We answer the questions certified by the federal district court as follows:

> 1. Can the City assert qualified immunity to a claim for damages for violation of the Iowa Constitution based on its officers' exercise of "all due care"?

Answer: The due care exemption under section 670.4(1)(*c*) could provide the City with immunity.

> 2. If the City can assert such a defense, on the facts presented in this case, does the City have "all due care" qualified immunity to liability for damages for the violation of Baldwin's right to be free from an unreasonable search and seizure under article I of the Iowa Constitution? This question necessarily includes questions about the extent to which reliance on a warrant may satisfy the "all due care" standard

and whether the "all due care" analysis considers alternative bases for probable cause or a warrant on which the officers did not rely.

Answer: The question as posed requires us to apply the facts of this case to the answer to certified question number 1. Therefore, we decline to answer certified question number 2.

3. If punitive damages are an available remedy against an individual defendant for a violation of a plaintiff's rights under the Iowa Constitution, can punitive damages be awarded against a municipality that employed the individual defendant and, if so, under what standard?

Answer: No. The punitive damages exemption under section 670.4(1)(*e*) precludes a plaintiff from collecting punitive damages from the municipal employer of the constitutional tortfeasor.

4. If punitive damages are available in answer to the previous question, would a reasonable jury be able to find that the applicable standard was met on the facts presented in this case?

Answer: Because we hold the IMTCA immunizes municipal employers of constitutional tortfeasors against punitive damages, we need not answer this question.

5. If an award of attorney's fees would have been available against an individual defendant for a plaintiff who attains some degree of success on a claim of a violation of a plaintiff's rights under the Iowa Constitution, would they be available against a municipality that employed the individual defendant and, if so, under what standard?

Answer: In a *Godfrey* action, a court cannot award attorney fees against the municipal employer of the constitutional tortfeasor unless there is an express statute allowing for such an award or the prevailing party satisfies the standard for common law attorney fees. We find no express statutory authorization for attorney fees here. As for common law

attorney fees, it will be up to the trial court to determine if Baldwin has met the common law standard.

> 6. If the answer to either Question No. 3 or Question No. 5 (or both) is in the affirmative, will retroactive application to the pending case be appropriate?

Answer: Because the IMTCA prohibits an award of punitive damages against the municipal employer of the constitutional tortfeasor, we need not answer this question with respect to punitive damages. With respect to common law attorney fees, we answer that it is appropriate to retroactively apply our conclusion that in a *Godfrey* action, common law attorney fees may be available against the municipal employer of the constitutional tortfeasor. Thus, Baldwin can receive an award of common law attorney fees in this action against the City if he can meet the standard for common law attorney fees.

**CERTIFIED QUESTIONS ANSWERED.**

All justices concur except Appel, J., who concurs in part and dissents in part.

#18–1856, *Baldwin v. City of Estherville*

**APPEL, Justice (concurring in part and dissenting in part).**

**I. Introduction.**

In *Baldwin v. City of Estherville* (*Baldwin II*), 915 N.W.2d 259, 281 (Iowa 2018), the majority of this court decided that a government official could assert a modified qualified immunity defense to a state constitutional tort under article I, sections 1 and 8 of the Iowa Constitution. For reasons expressed in my dissenting opinion in *Baldwin II*, I was unable to join the majority opinion. *Id.* (Appel, J., dissenting). I continue to believe there is no immunity available to shield individual state officers from liability for alleged harm caused by their unconstitutional conduct in violation of article I, sections 1 and 8 of the Iowa Constitution. *Id.*

On the issues raised in this case,[3] I dissent in part from the majority's holding regarding the potential liability of the city. I agree that the city may be held liable for state constitutional torts under a respondeat superior theory. But I do not believe the government entity is entitled to assert a defense of qualified immunity. As expressed in *Baldwin II*, I do not believe that officers and agents are entitled to qualified immunity, and as a result, such a defense does not pass through to the governmental entity under respondeat superior. Further, even if the individual officers and agents of the government are entitled to quasi-immunity, it should not extend to claims against a municipal entity under respondeat superior.

On the question of punitive damages, I dissent from the majority. In a search and seizure case, for reasons I explain below, it is critical that

---

[3]I agree with the majority to limit our answers to questions of law posed in the certified questions presented by the federal district court.

punitive damages be available against a government entity in a proper case in order to provide an adequate remedy to the state constitutional tort.

On the question of attorney fees, I agree with the majority that attorney fees may be available under the bad faith theory we have long recognized at common law. But I also believe that attorney fees, in an appropriate case, may be available under what has been called the private attorney general theory.

## II. Overview of State Constitutional Torts.

At the outset, it is important to understand exactly what a state constitutional tort is. A state constitutional tort is a claim that may be brought by a person for harms by government authorities arising from a violation of a rights-creating provision of the Iowa Constitution. *Godfrey v. State*, 898 N.W.2d 844, 847 (Iowa 2017). The claim is implied in the substantive provisions of the Iowa Bill of Rights contained in article I of the Iowa Constitution. *See id.* at 868. It is supported by the basic principle that there is no right without a remedy. *Id.* at 867. A state constitutional tort arises out of the provisions of the Iowa Bill of Rights and does not require any enabling legislation by the legislature. *Id.* at 870.

Further, if unconstitutional conduct sufficient to support a state constitutional tort is present, we must next determine whether government defendants are entitled to immunities or affirmative defenses, and if so, what the scope of those immunities or affirmative defenses might be. In *Baldwin II*, for instance, a majority of this court determined that government officials and agents who engage in certain unconstitutional conduct that harms plaintiffs may assert a modified type of qualified immunity. 915 N.W.2d at 281 (majority opinion).

The legislature may enact statutes that provide for reasonable procedures for the assertion of state constitutional claims. *Godfrey*, 898

N.W.2d at 873. The legislature, however, cannot limit the substantive scope of state constitutional violations. *Id.* at 866–69, 874–75. Determining the scope of constitutional rights is the province of the judiciary. *Id.* To the extent the legislature seeks to regulate remedies, it cannot reduce them below a constitutionally required minimum necessary to ensure adequate vindication of state constitutional interests. *Id.* at 876.

### III. Liability of Municipalities for State Constitutional Torts of Their Officers or Agents.

**A. Introduction.** The first question posed in this case is whether and under what circumstances a municipality may be held liable for the state constitutional torts of its officers or agents. In considering such questions, at least two lines of cases are frequently examined which, though not binding, may be instructive.

First, common law treatment of municipal liability prior to the enactment of the constitution may be examined. An argument can be made, for example, that the preconstitutional immunities available at common law for claims against municipalities should apply to state constitutional torts in the postconstitutional era. The common law influence theory is based on the proposition that state constitutional founders would have intended any preconstitutional immunities generally available to municipalities when faced with tort claims would also would apply to torts arising from state constitutional provisions.

Any analogy between common law and constitutional claims, however, is at best inexact. A constitutional tort is designed not only to provide compensation for injuries but also to vindicate constitutional rights. *Id.* at 876–79 (plurality opinion); *see Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 409, 91 S. Ct. 1999, 2011 (1971) (Harlan, J., concurring in the judgment). The high importance

of ensuring that the basic constitutional rights in the Iowa Bill of Rights are recognized and enforced is wholly absent in ordinary tort litigation against municipalities. *Godfrey*, 898 N.W.2d at 876–79. A constitutional tort seeks to compensate for harms to the public as well as harms to individuals arising from the unconstitutional conduct of government. *Id.* Unlike common law claims, constitutional violations are often not accompanied by physical injuries and the deterrence arising from parsimonious compensation for them is often very weak. Michael Wells, *Constitutional Remedies, Section 1983 and the Common Law*, 68 Miss. L.J. 157, 215 (1998). For these reasons, a constitutional tort is thus said to be "a fundamentally different legal artifact from common law tort." *Id.* at 159; *see also* Sheldon H. Nahmod, *Section 1983 and the "Background" of Tort Liability*, 50 Ind. L.J. 5, 32–33 (1974) ("[C]ourts in 1983 cases must be careful not to let tort law alone determine 1983 liability; for not only possibly different purposes, but different interests as well are usually at stake."). We should be careful not to allow common law limitations to impede the vindication of state constitutional rights.

Further, there is a certain amount of irony in the referral to common law doctrine in determining the scope of recovery for constitutional harms under 42 U.S.C. § 1983 (2017). Indeed, one of the reasons why § 1983 was passed was the inadequacy of common law remedies to protect citizens from constitutional violations. *Monroe v. Pape*, 365 U.S. 167, 173–74, 81 S. Ct. 473, 477 (1961), *overruled on other grounds by Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690, 98 S. Ct. 2018, 2035 (1978); *see* Note, *Damage Awards for Constitutional Torts: A Reconsideration After* Carey v. Piphus, 93 Harv. L. Rev. 966, 976 (1980).

Finally, the genius of the common law was its flexibility and its ability to evolve to meet contemporary realities. Thus, the common law

method requires us not to adopt frozen concepts of the past but to study them and adapt them, where appropriate, to the present. Nahmod, 50 Ind. L.J. at 33. While the historical common law approach may inform us, it cannot control the present.

The second approach to analyzing constitutional torts involves examination of cases under the Civil Rights Act of 1871, codified at 42 U.S.C. § 1983. Section 1983 provides a statutory avenue for injured parties to bring claims based on, among other things, violations of the United States Constitution. Cases under § 1983 have considered the scope of liability and potential immunities available to government actors when constitutional violations arise.

In looking at the § 1983 cases for illumination in the context of state constitutional torts, there are three important caveats. First, the cases under § 1983 are statutory in nature and often turn on the specific language and statutory history that is not germane to interpretation of a state constitutional tort.

Second, and of great importance, a plaintiff in a § 1983 action seeks to thrust federal courts into the operations of state and local governments. As a result of federalism implications, the § 1983 cases of the United States Supreme Court seek to minimize federal intervention in these local matters. *See* Note, *Developments in the Law: Section 1983 and Federalism*, 90 Harv. L. Rev. 1133, 1179 (1977). The end result is a tendency in the § 1983 cases to underenforce federal constitutional rights. Thus, while the § 1983 cases are worth a careful read, it must be understood that they are substantially influenced by the diluting federalism concerns that have no application at all when a state court considers the scope, defenses, or remedies available to vindicate state constitutional claims.

Third, in recent years, the United States Supreme Court has adopted a rights-restricting approach to many aspects of constitutional law. It has utilized a wide host of fairly technical legal doctrines such as pleading standards, *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009); *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556, 127 S. Ct. 1955, 1965 (2007), standing doctrine, *City of Los Angeles v. Lyons*, 461 U.S. 95, 105–06, 103 S. Ct. 1660, 1667 (1983) (denying injunction against police chokeholds because plaintiff had only been injured once), and state-leaning approaches to summary judgment, *see, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986), that tend to materially lessen the scope of judicial remedies available for alleged constitutional violations. For those who seek to avoid slippage between constitutional norms and their enforcement, recent United States Supreme court cases may have limited utility.

**B. Common Law History of Municipal Liability.** There are many common law cases addressing the potential liability of municipalities in tort that predate state or federal constitutions. The verdict of common law history is clear: municipalities at common law were generally liable in tort to the same extent as corporations or any other private parties. Specifically, there were virtually no authorities suggesting, for instance, that a municipality was entitled to some kind of good-faith immunity. *See Owen v. City of Independence*, 445 U.S. 622, 641–42, 100 S. Ct. 1398, 1411 (1980) (citing cases).

The Iowa common law cases are consistent with the general rule. *See Cotes v. City of Davenport*, 9 Iowa 227, 235 (1859) (stating it is well established that a municipal corporation is liable in a negligence case to the same extent as a private person). Thus, to the extent common law is

our guide, municipalities should not be entitled to quasi-immunity for their state constitutional torts.

**C. Approaches of United States Supreme Court Caselaw Under 42 U.S.C. § 1983.** In a series of cases, the United States Supreme Court has considered the scope of potential liability of municipalities under the Civil Rights Act of 1871. 42 U.S.C. § 1983. In *Monroe*, 365 U.S. at 169, 81 S. Ct. at 474, petitioners alleged that thirteen police officers broke into their home, made them stand naked in the living room, ransacked all the rooms of the house, took them to the station for ten hours, interrogated them, and then released them, all without a warrant. With respect to individual defendants, the *Monroe* Court concluded that they acted under color of law under § 1983 and, as a result, reversed lower court rulings to the contrary. *See id.* at 187, 81 S. Ct. at 484. With respect to the City of Chicago as defendant, however, the *Monroe* Court held that municipalities were not "persons" under § 1983 and could not be held accountable under the statute for inflicting state constitutional harms. *Id.* at 187–92, 81 S. Ct. at 484–86.

Seventeen years after *Monroe*, however, the Supreme Court reversed course in *Monnell*, 436 U.S. at 690, 98 S. Ct. at 2035. In *Monnell*, female employees of New York governmental entities challenged a policy that "compelled pregnant employees to take unpaid leaves of absence before such leaves were required for medical reasons." *Id.* at 660–61, 98 S. Ct. at 2020. The *Monnell* Court overruled *Monroe* in part and held that municipalities were persons under § 1983. *Id.* at 690, 98 S. Ct. at 2035. Further, the *Monnell* Court declared that municipalities could be held liable under § 1983 when officials were executing "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* at 690, 98 S. Ct. at 2035–36.

But the *Monnell* Court further held that Congress did not intend for a municipality to be held liable "solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691, 98 S. Ct. at 2036. In reaching this conclusion, the *Monnell* Court emphasized the word "causes" in the statute. *Id.* at 692, 98 S. Ct. at 2036. The *Monnell* Court reasoned that in order for the municipality to cause the constitutional infringement, there must be a policy or practice giving rise to it. *Id.* at 694, 98 S. Ct. at 2037–38. In the case presently before us, the city urges that we import the Supreme Court's statutory interpretation in *Monnell* into the substance of our state constitutional law.

In *Monnell*, the Supreme Court expressly noted that the question of whether local government bodies were entitled to some form of official immunity was not presented in the case. *Id.* at 701, 98 S. Ct. at 2041. While the *Monnell* Court made clear that absolute immunity would not be appropriate, it took no view on any other form of immunity that might be available. *Id.*

The Supreme Court addressed the question of whether a municipality was entitled to some form of immunity in *Owen*, 445 U.S. at 635, 100 S. Ct. at 1407. In *Owen*, a former police chief brought an action against the city, the city manager, and members of the city council alleging he was terminated from employment without notice and an opportunity to be heard. *Id.* at 630, 100 S. Ct. at 1404–05. The *Owen* Court rejected the city's assertion that it was entitled to qualified immunity. *Id.* at 638, 100 S. Ct. at 1409. The *Owen* Court noted the statute itself did not contain any immunities. *Id.* at 635, 100 S. Ct. at 1407. Further, the *Owen* Court canvassed the legislative history of the Civil Rights Act and found no support for some form of municipal immunity. *Id.* at 635–38, 100 S. Ct.

at 1407–09. The *Owen* Court further reviewed caselaw, concluding that it was generally understood that a municipality's tort liability was identical to private organizations and individuals. *Id.* at 639–50, 100 S. Ct. at 1409–15.

The *Owen* Court proceeded to consider the public policy purposes of recovery for constitutional wrongs. The *Owen* Court noted,

> A damages remedy against the offending party is a vital component of any scheme for vindicating cherished constitutional guarantees, and the importance of assuring its efficacy is only accentuated when the wrongdoer is the institution that has been established to protect the very rights it has transgressed.

*Id.* at 651, 100 S. Ct. at 1415.

The *Owen* Court noted, however, that individual defendants under § 1983 had been afforded qualified immunity. *Id.* at 651, 100 S. Ct. at 1415. Because of the presence of qualified immunity for individual officers, the *Owen* Court noted that "victims of municipal malfeasance would be left remediless if the city were also allowed to assert a good-faith defense." *Id.* The *Owen* Court emphasized that absent countervailing considerations to the contrary, the injustice of a victim going without a remedy "should not be tolerated." *Id.*

The *Owen* Court found no countervailing considerations and emphasized the need to deter future violations. *Id.* at 651, 100 S. Ct. at 1416. The *Owen* Court noted that potential liability "should create an incentive for officials who may harbor doubts about the lawfulness of their intended actions to err on the side of protecting citizens' constitutional rights." *Id.* at 651–52, 100 S. Ct. at 1416. The *Owen* Court further observed that "[i]t hardly seems unjust to require a municipal defendant which has violated a citizen's constitutional rights to compensate him for the injury suffered thereby." *Id.* at 654, 100 S. Ct. at 1417. Additionally,

the Owen Court cited a leading state court case for the proposition that "the city, in its corporate capacity, should be liable to make good the damage sustained by an [unlucky] individual." *Id.* at 654–55, 100 S. Ct. at 1417 (alteration in original) (quoting *Thayer v. City of Boston*, 36 Mass. 511, 515 (1837)).

Finally, the *Owen* Court noted that the purpose of qualified immunity for individual officers "is the concern that the threat of personal monetary liability will introduce an unwarranted and unconscionable consideration into the decisionmaking process, thus paralyzing the governing official's decisiveness and distorting his judgment on matters of public policy." *Id.* at 655–56, 100 S. Ct. at 1418. The *Owen* Court emphasized, however, that the inhibiting effect is significantly reduced when municipal liability is involved. *Id.* at 656, 100 S. Ct. at 1418. The *Owen* Court observed that it is questionable whether the possibility of municipal liability will deter decision-makers from conscientious exercise of public authority. *Id.* In any event, the *Owen* Court regarded deterrence in positive terms, noting concerns that should shape decision-making include the constitutional rights of persons affected by the action. *Id.*

The Supreme Court next considered the question of immunities in *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 810, 105 S. Ct. 2427, 2429 (1985). Here, a widow of a man shot by a police officer brought a § 1983 claim alleging that her husband had been killed without due process of law as a result of a city providing inadequate training to police officers. *Id.* at 811–12, 105 S. Ct. at 2430. The jury returned a verdict in favor of the police officer but awarded $1,500,000 against the city. *Id.* at 813, 105 S. Ct. at 2431. The United States Court of Appeals for the Tenth Circuit affirmed. *Tuttle v. City of Oklahoma City*, 728 F.2d 456, 461 (10th Cir. 1984).

The *Tuttle* Court reversed. 471 U.S. at 814, 105 S. Ct. at 2431. The *Tuttle* Court emphasized that the plaintiff offered no evidence of a single act by a municipal policymaker but only based her claim on a single incident involving the use of excessive force and a subsequent inference that the training of the officer must have been inadequate as a result of city policy. *Id.* at 821, 105 S. Ct. at 2435. The *Tuttle* Court emphasized that liability could not be imposed because the municipality hired one "bad apple." *Id.* The *Tuttle* Court declared that liability under *Monnell* cannot be established without proof that the harm was "caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *Id.* at 824, 105 S. Ct. at 2436.

Notably, Justice Stevens dissented. *Id.* at 834, 105 S. Ct. at 2441 (Stevens, J., dissenting). Justice Stevens emphasized that at the time § 1983 was enacted, the doctrine of respondeat superior was well recognized in the common law. *Id.* at 835, 105 S. Ct. at 2442. Justice Stevens further noted that § 1983 was designed primarily to provide a remedy for constitutional violations, which he characterized as "wrongs of the most serious kind." *Id.* at 839, 105 S. Ct. at 2444. He pointed out that the act of the individual officer could be considered unconstitutional only if he was acting on behalf of the state. *Id.* Justice Stevens reasoned that if an officer's conduct was sufficient to satisfy state action requirements, the municipality should be liable under ordinary principles of tort law. *Id.* at 839–40, 105 S. Ct. at 2444–45.

In closing, Justice Stevens emphasized that respondeat superior liability should apply with special force because of the special quality of the interests at stake. *Id.* at 843, 105 S. Ct. at 2446. He argued that the interests in compensating the victim, deterring violations by creating sound municipal policy, and providing fair treatment toward individual

officers performing difficult and dangerous work all point toward placing primary responsibility on the municipal corporation. *Id.* at 843–44, 105 S. Ct. at 2446–47.

The question of liability under § 1983 arose again in *Pembaur v. City of Cincinnati,* 475 U.S. 469, 471, 106 S. Ct. 1292, 1294 (1986). In *Pembaur,* a physician brought a § 1983 action after sheriff's deputies chopped down the door of his office with an axe in an attempt to serve legal process on two of his employees. *Id.* at 473–74, 106 S. Ct. at 1295. The district court dismissed the action and the Sixth Circuit affirmed in part and reversed in part. *Id.* at 475, 106 S. Ct. at 1296.

In an opinion by Justice Brennan, the *Pembaur* Court held that the county could be liable under § 1983 under the facts presented. *Id.* at 484, 106 S. Ct. at 1300. In *Pembaur,* the decision to forcibly enter the physician's office was made in consultation with the county prosecutor. *Id.* The *Pembaur* Court noted a single decision made by an authorized municipal policymaker may amount to a policy under *Monnell. Id.* at 480, 106 S. Ct. at 1298. According to the *Pembaur* Court, liability under § 1983 could be established when "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* at 483, 106 S. Ct. at 1300.

Justice Stevens wrote separately. *Id.* at 487, 106 S. Ct. at 1302 (Stevens, J., concurring in part and concurring in the judgment). He emphasized, again, that § 1983 was intended to impose liability on the government for illegal acts, including those performed by agents in the course of their employment. *Id.* at 489, 106 S. Ct. at 1303. According to Justice Stevens, the primary responsibility for protecting the constitutional rights of the residents of the county rested on the shoulders

of the county itself rather than on agents that were trying to do their jobs. *Id.* at 490, 106 S. Ct. at 1304. According to Justice Stevens, "The county has the resources and the authority that can best avoid future constitutional violations and provide a fair remedy for those that have occurred in the past." *Id.*

Finally, the Supreme Court considered § 1983 liability in *Board of County Commissioners v. Brown,* 520 U.S. 397, 400, 117 S. Ct. 1382, 1386 (1997). In *Brown,* the plaintiff brought a § 1983 action in connection with injuries suffered at a traffic stop where she was forcibly removed from her automobile after it had been pulled over. *Id.* at 399–400, 117 S. Ct. at 1386. A verdict was entered for the plaintiff. *Id.* at 400, 117 S. Ct. at 1386 The Fifth Circuit affirmed, finding that the county could be held liable for a sheriff's single decision to hire a deputy after an inadequate background check. *Id.*

The *Brown* Court held that the plaintiff had not established a basis for liability under § 1983. *Id.* The *Brown* Court concluded that the mere hiring by the sheriff of a deputy whose qualifications might later be questioned did not establish a policy under *Monnell.* *Id.* at 404–05, 117 S. Ct. at 1388–89. The *Brown* Court emphasized the need to show causation and fault in order to establish § 1983 liability. *Id.* at 406–07, 117 S. Ct. at 1389–90.

Justice Breyer dissented. *Id.* at 430, 117 S. Ct. at 1401 (Breyer, J., dissenting). He squarely took on *Monnell.* *See id.* He noted that the rejection of respondeat superior in *Monnell* rested on poor history. *Id.* at 431, 117 S. Ct. at 1401. Justice Breyer criticized the caselaw splitting hairs over what amounted to "policy" under *Monnell.* *Id.* at 433–34, 117 S. Ct. at 1402–03. Finally, Justice Breyer noted that current developments, including the trend of cities indemnifying officers for their

constitutional torts, suggest *Monnell* may be outdated. *Id.* at 436, 117 S. Ct. at 1403–04.

**D.  Discussion of Respondeat Superior Liability.**  At the outset, I would decline the city's request that we cut and paste the *Monnell* "policy or custom" approach into the caselaw on Iowa constitutional torts.  As demonstrated by Justice Stevens, the historical argument rejecting respondeat superior is simply wrong. *Tuttle,* 471 U.S. at 835, 105 S. Ct. at 2442.  Further, from a policy perspective, as again noted by Justice Stevens, the municipal entities themselves are in the best position to modify their conduct and the conduct of employees in a fashion to secure compliance with constitutional demands. *Pembaur,* 475 U.S. at 490, 106 S. Ct. at 1304; *Tuttle,* 471 U.S. at 843–44, 105 S. Ct. at 2446–47.  Therefore, from a deterrence perspective, it makes sense to apply respondeat superior in the case of constitutional torts.  Further, experience has shown that proving policy or custom is exceedingly problematic.  The *Monnell* doctrine has introduced unnecessary complexity into the law. *See Brown,* 520 U.S. at 433–37, 117 S. Ct. at 1402–04.

In addition, one of the reasons for the adoption of the *Monnell* doctrine was to avoid thrusting federal courts into local affairs. *See City of Canton v. Harris,* 489 U.S. 378, 392, 109 S. Ct. 1197, 1206 (1989) (noting respondeat superior would lead to endless exercise of second-guessing municipal employee training programs and would implicate serious problems of federalism).  The federalism problems simply are not present when the claims are brought in a local state court.

The next question is whether we should import qualified immunity to claims against the municipality.  In *Baldwin II*, the majority found a modified form of qualified immunity applied to officers and agents of the

state. 915 N.W.2d at 281. But that does not necessarily mean the same type of immunity is available for municipal entities. On the question of quasi-immunity for municipal entities, I think the proper answer is no for the following reasons.

First, I note that qualified immunity for municipal entities was not part of the common law. *See Owen*, 445 U.S. at 641–42, 100 S. Ct. at 1411. While plainly not dispositive, the lack of qualified immunity at common law certainly undermines one of the rationales for rejecting respondeat superior. The notion of respondeat superior liability for municipal entities similar to that applicable to corporations has not proven problematic.

Second, a damages remedy "is a vital component of any scheme for vindicating cherished constitutional guarantees." *Id.* at 651, 100 S. Ct. at 1415. Respondeat superior liability of a municipal entity ensures that where there is a right, there is a remedy. *See generally Bivens*, 403 U.S. at 400 n.3, 91 S. Ct. at 2007 n.3 (noting "modes of jurisprudential thought" at the time of the United States Constitutional Convention that "appeared to link 'rights' and 'remedies' in a 1:1 correlation"). Without it, there will be a gap between established constitutional rights and the remedies available to vindicate those rights. From a practical perspective, the municipal entity is in a good position to pay compensation and spread the cost among taxpayers.

And, the majority's decision in *Baldwin II* to adopt a modified form of qualified immunity strengthens the case for adoption of respondeat superior for claims against municipalities. As noted by Justice Brennan, "[M]any victims of municipal malfeasance would be left remediless if the city were also allowed to assert a good-faith defense. Unless countervailing

considerations counsel otherwise, the injustice of such a result should not be tolerated." *Owen*, 445 U.S. at 651, 100 S. Ct. at 1415.

Third, as noted by Justice Stevens, the municipal entity itself is likely to be in the best position to implement corrective measures to vindicate constitutional rights. *Pembaur*, 475 U.S. at 490, 106 S. Ct. at 1304; *Tuttle*, 471 U.S. at 843–44, 105 S. Ct. at 2446–47. If a municipal entity is liable for state constitutional torts of its officers and agents, there will be a strong incentive to make sure training programs are adequate and that hiring processes properly screen potential city employees. Liability against an individual officer does not offer a similar prospect of forward-looking action to lessen the risk of future unconstitutional conduct.

Finally, for the reasons expressed in my dissent in *Baldwin II*, I do not believe that municipal officers and agents are entitled to qualified immunity. 915 N.W.2d at 281 (Appel, J., dissenting). As a result, from my perspective, just as the agent or employee had no qualified immunity defense, the municipality under respondeat superior would have no qualified immunity defense.

**IV. Liability of the City for Punitive Damages.**

**A. Introduction.** One of the most remarkable developments in law occurred in England during the late eighteenth century. The story is old but good. John Wilkes was, literally, a royal pain, an irreverent, in your face, irresponsible, arrogant, impulsive, and disrespectful dandy. Arthur H. Cash, *John Wilkes: The Scandalous Father of Civil Liberty* 1–2 (2006) [hereinafter Cash]. Some of us probably would not have liked him. After the publication of a scurrilous article appeared in a political magazine attacking the king and his advisors, the government went on a rampage, searching dozens of locations and seizing scores of people—the usual

suspects, no doubt—for telltale signs of responsibility, or complicity, in the article's publication. Thomas K. Clancy, *The Fourth Amendment: Its History and Interpretation* 36 (1st ed. 2008) [hereinafter Clancy]; Phillip A. Hubbart, *Making Sense of Search and Seizure Law: A Fourth Amendment Handbook* 41 (1st ed. 2005) [hereinafter Hubbart]; Nelson B. Lasson, *The History and Development of the Fourth Amendment to the United States Constitution* 43 (1937) [hereinafter Lasson]. Wilkes was seized and his living quarters searched as part of the general dragnet. Clancy at 36; Lasson at 44; Andrew E. Taslitz, *Reconstructing the Fourth Amendment: A History of Search and Seizure, 1789–1868* at 20 (2006).

It turned out that the King and his retainers picked on the wrong guy. He sued those responsible for an unlawful search and won *substantial* judgments in English courts. *See Wilkes v. Wood* (1763) 98 Eng. Rep. 489, 489, 498–99; Hubbart at 42; Lasson at 45. He received substantial punitive damages against the individual officers involved. *Wilkes*, 98 Eng. Rep. at 498; *see* Hubbart at 42; Lasson at 45. The *Wilkes* cases were a seminal rule of law development, holding the King's agents personally liable for unlawful conduct.

Wilkes' success in the courts won wide international acclaim. His name was well known in the American colonies. Cash at 2; Hubbart at 47; Taslitz at 21. His birthday was widely celebrated in the New World, and he carried on correspondence with prominent Americans. Cash at 2; Hubbart at 47; Taslitz at 21. In the famous *Paxton's case*, James Otis waxed eloquent about the events across the ocean, thrilling a young lawyer in the audience, John Adams. Jacob W. Landynski, *Search and Seizure and the Supreme Court: A Study in Constitutional Interpretation* 34–37 (1966) (quoting 10 John Adams, Life and Works of John Adams 247–48 (1856)). It is an unpleasant but revealing fact that John Wilkes Booth got

his middle name from the Englishman, the point being that Wilkes and his successes in court over the exercise of arbitrary government power were well known through America decades after the events in question. *See* Josh Chafetz, *Impeachment and Assassination*, 95 Minn. L. Rev. 347, 389 (2010).

There is no question that the generation of Iowans who established statehood knew the Wilkes story. The Iowa Supreme Court cited one of his cases in 1855. *Sanders v. State*, 2 Iowa 230, 239 (1855). Today, however, Wilkes seems to have been forgotten, or perhaps more accurately ignored, by ahistorical thinkers who view punitive damages as a virus that needs to be isolated and ultimately eradicated. But historically, the awards of punitive damages for illegal government searches and seizures in the *Wilkes* cases were thought to represent an epic success in the effort to control unbridled government power.

The *Wilkes* cases did not involve claims for punitive damages against government entities, only against the officers. They do, however, stand for the proposition that punitive damages in general can play an important part in vindicating the public's interest in restraining arbitrary government. And, the *Wilkes* cases are a predicate to an important question: if punitive damages are available against individual defendants, why should they not be available against municipalities?

**B. Punitive Damages Against Municipalities at Common Law.** As a general rule, municipalities at common law historically were not subject to punitive damages. For instance, in *Bennett v. City of Marion*, 102 Iowa 425, 426, 71 N.W. 360, 360 (1897), the court held punitive damages were not available against a municipal corporation.

The court, however, took a different tack in *Young v. City of Des Moines*, 262 N.W.2d 612, 614 (Iowa 1978) (en banc). In *Young,* the

plaintiff brought a claim for false arrest against the city. *Id.* The *Young* court noted that given the developments in tort law in Iowa, liability is now the rule, with immunity being the exception. *See id.* at 620–21. The Municipal Tort Claims Act did not expressly exclude punitive damages. *Id.* at 622.

The *Young* court acknowledged that the weight of authority at the time was against allowing such damages absent a statute expressly allowing them. *Id.* at 621. The *Young* court canvassed the public policy rationale for excluding punitive damages and found them unpersuasive. *Id.* at 621–22. The *Young* court noted that "if a governmental subdivision be held answerable in punitive damages, more care will go into the selection and training of its agents and employees." *Id.* at 621–22. The *Young* court further declared it was not convinced that the wealth of the municipality is a problem as the amount of punitive damages was determined by the sound judgment of the jury, subject to judicial review. *Id.* at 622. The *Young* court declared that, where appropriate, punitive damages against governmental subdivisions "will further deter unfounded and oppressive peace officer conduct under the guise of official action." *Id.* The *Young* court noted, however, that if the legislature intended to bar punitive damages, it could amend the applicable statute. *Id.*

Several years later, the legislature amended the Iowa Municipal Tort Claims Act to bar an award of punitive damages against municipalities for cases in tort, partially abrogating *Young.* 1982 Iowa Acts ch. 1018, § 5 (codified at Iowa Code § 613A.4(5) (1983), now Iowa Code § 670.4(*e*) (2019)). In *Parks v. Marshalltown,* 440 N.W.2d 377, 379 (Iowa 1989), the court considered the validity of an award of punitive damages in a case involving a verdict in favor of the plaintiff on a breach of contract theory. The *Parks* court reasoned that if punitive damages were not available in a

tort action, they should not be available in a contract action. *Id.* The *Parks* court did not consider the validity of the legislation as applied to constitutional torts. *See id.*

**C. Discussion of Punitive Damages in *Godfrey*.** In *Godfrey*, 898 N.W.2d at 847 (majority opinion), we held that a plaintiff could bring a state constitutional tort for violations of equal protection and due process brought against government officials. With respect to the equal protection claim, the defendants argued that the remedies provided by the Iowa Civil Rights Act were exclusive and that a constitutional tort based on equal protection could not be brought outside the statute. *Id.* at 849, 873. Because the Iowa Civil Rights Act did not provide for punitive damages, a question arose whether the remedies provided by the statute were "adequate" to vindicate the constitutional rights of the plaintiff. *Id.* at 875.

Three members of the court concluded that the remedy provided by the Iowa Civil Rights Act was not adequate because of the lack of a punitive damages provision. *Id.* at 876–79 (plurality opinion). Chief Justice Cady wrote the determinative opinion. *Id.* at 880–81 (Cady, C.J., concurring in part and dissenting in part). He reasoned that punitive damages might well be a required remedy in *some* state constitutional tort but not on the claim presented in *Godfrey*. *Id.* at 881. He specifically left the door open for an award of punitive damages in *Wilkes*-type cases. *Id.* For the majority of the *Godfrey* court, it seems clear as a matter constitutional law that punitive damages should be available in at least some cases notwithstanding legislative action to the contrary. *Id.* at 876–79 (plurality opinion); *id.* at 880–81 (Cady, C.J., concurring in part and dissenting in part).

**D. Punitive Damages Against Municipalities for Constitutional Torts in the United States Supreme Court.** The seminal United States

Supreme Court case regarding recovery of punitive damages against a municipality in a § 1983 case is *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 249, 101 S. Ct. 2748, 2750 (1981). In *City of Newport,* an organization licensed to present music concerts and a rock concert promoter sued the city and city officials under § 1983 for cancelling a music concert license. *Id.* at 252, 101 S. Ct. at 2752. The jury returned a verdict in favor of the plaintiffs and awarded compensatory and punitive damages, including a punitive damage verdict against the city of $200,000. *Id.* at 253, 101 S. Ct. at 2752. The First Circuit affirmed. *Fact Concerts, Inc. v. City of Newport*, 626 F.2d 1060, 1061 (1st Cir. 1980).

The *City of Newport* Court vacated the court of appeals' opinion. 453 U.S. at 271, 101 S. Ct. at 2762. The *City of Newport* Court noted that at common law, immunity of municipal corporations from punitive damages was not subject to serious question and continues to be the law in a majority of jurisdictions. *Id.* at 259, 101 S. Ct. at 2756. Because immunity from punitive damages was established at common law, the *City of Newport* Court proceeded on the assumption that Congress would have specifically addressed the issue had it intended to allow liability for punitive damages under § 1983. *Id.* at 263, 101 S. Ct. at 2758.

Turning to public policy, the *City of Newport* Court observed that an award of punitive damages against a municipality punishes taxpayers. *Id.* at 267, 101 S. Ct. at 2760. While the *City of Newport* Court recognized it had previously suggested that punitive damages might in appropriate circumstances be awarded to punish violations of constitutional rights, the Court said that the retributive purpose was not significantly advanced by exposing municipalities to punitive damages. *Id.* at 268, 101 S. Ct. at 2760.

The *City of Newport* Court also declared that it was "far from clear" that municipal officers would be deterred by an award of punitive damages. *Id.* at 268–69, 101 S. Ct. at 2760–61. The *City of Newport* Court stated that a more effective remedy would be to assess punitive damages against the offending public officials. *Id.* at 269, 101 S. Ct. at 2761. In footnote 29, however, the *City of Newport* Court stated that "[i]t is perhaps possible to imagine an extreme situation where the taxpayers are directly responsible for perpetrating an outrageous abuse of constitutional rights" but that such a scenario was sufficiently unlikely that the Court "need not anticipate it here." *Id.* at 267 n.29, 101 S. Ct. at 2760 n.29.

Following *City of Newport*, plaintiffs have attempted to evade its holding by pointing to footnote 29. For example, in *Webster v. City of Houston*, 689 F.2d 1220, 1221 (5th Cir. 1982), plaintiff claimed the police had adopted a custom of carrying guns or knives as "throw downs" to be planted near suspects who are shot in dubious circumstances. The Fifth Circuit, though finding the plight of the plaintiff "reprehensible," held that the actions were not sufficiently outrageous to support a punitive damages claim against the municipality under footnote 29 of *City of Newport*. *Id.* at 1229. Similarly, in *Heritage Homes of Attleboro, Inc. v. Seekonk Water District*, 670 F.2d 1, 2 (1st Cir. 1982), the First Circuit declined to allow punitive damages where some voters engaged in "blatant raci[st] discussions" before the water district voted to exclude a housing developer willing to sell units to black families. The First Circuit reasoned that only a small claque of voters engaged in the commentary and that there was no widespread knowledgeable participation by taxpayers of the district. *Id.*

Perhaps the most interesting response to *City of Newport* occurred in *Ciraolo v. City of New York*, 216 F.3d 236 (2d Cir. 2000). In this case, Judge Calabresi wrote both the majority opinion and a concurring opinion.

*Id.* at 237 (majority opinion); *id.* at 242 (Calabresi, J., concurring). In *Ciraolo*, a plaintiff claimed that after she was arrested on misdemeanor charges in connection with a spat with her neighbor, she was taken to jail, ordered to strip naked, and made to bend down and cough while visually inspected. *Id.* at 237 (majority opinion). The city conceded liability as there was a uniform policy to strip search all females upon their arrival at the jail, and a trial was held on the question of damages. *Id.* at 238. A jury awarded the plaintiff $19,645 in compensatory damages and $5,000,000 in punitive damages. *Id.*

In his majority opinion, Judge Calabresi found that footnote 29 in *City of Newport* was not designed to allow punitive damages for especially outrageous misconduct but instead, at most, was designed to address a situation where taxpayers themselves participate in the unlawful action such as where taxpayers adopt an unconstitutional policy through a referendum. *Id.* at 240. Under the circumstances, Judge Calabresi, for the court, reversed the award of punitive damages. *Id.* at 242.

In his concurring opinion, Judge Calabresi expressed that although the result in the case was compelled by the Supreme Court, he believed a better outcome would have been to allow punitive damages. *Id.* at 242 (Calabresi, J., concurring). Judge Calabresi wrote that punitive damages can ensure a wrongdoer bears all the costs of action where compensatory damages alone result in "systematic underassessment of costs, and hence in systematic underdeterrence." *Id.* at 243. Judge Calabresi noted that not all persons injured by an unconstitutional action by a municipality will sue, either because compensatory damages are likely to be relatively low or because their knowledge and access to the legal process are poor and unsophisticated. *Id.* at 243–44.

As a result, compensatory damages in a wide category of cases are an inaccurate indicator of the true level of harm inflicted by government conduct. *Id.* at 244; *see* A. Mitchell Polinsky & Steven Shavell, *Punitive Damages: An Economic Analysis*, 111 Harv. L. Rev. 869, 889 (1998). Judge Calabresi noted that although extracompensatory damages have been labeled "punitive damages," a more appropriate name for such damages designed to avoid underdeterrence might be "socially compensatory damages." *Ciraolo*, 216 F.3d at 245. Judge Calabresi emphasized that once it is recognized that remedying underdeterrence is an appropriate function of extracompensatory damages against a municipality, and that this goal is separate from punishment, the objections to punitive damages lose much of their force. *Id.* at 248.

**E. Discussion of Availability of Punitive Damages in Actions Against Municipalities.** In considering the availability of punitive damages against municipalities, it is important to begin the discussion with a recognition of the difference between a private dispute between two parties and a state constitutional tort claim against government. The latter involves only private interests, but the former is imbued with an important public interest. *Bivens*, 403 U.S. at 409, 91 S. Ct. at 2011 (Harlan, J., concurring in the judgment); *Godfrey*, 898 N.W.2d at 876–79 (plurality opinion). That important public interest is in ensuring that government not violate the fundamental rights enshrined in the very first article of the Iowa Constitution, the provision characterized as "the most important provisions" of the entire constitution. *Godfrey*, 898 N.W.2d at 870 (majority opinion).

Further, in examining the question of deterrence, Calabresi has it right, namely, that in addition to specific deterrence involving the parties to a controversy, there is the question of general deterrence, or what he

calls "socially compensatory damages." *Ciraolo*, 216 F.3d at 245. In this context, it is important that payment of relatively small amounts to particular litigants do not become a license for unconstitutional conduct that simply becomes a routine part of overhead for government operations.

In considering the deterrence issue, the *City of Newport* Court questioned whether a punitive damage award against a public entity would be effective. *City of Newport*, 453 U.S. at 268–69, 101 S. Ct. at 2760–61. But a year earlier in *Owen*, the Court indicated that compensatory damages would create an incentive for government to conform its conduct to constitutional concerns. 445 U.S. at 651–52, 100 S. Ct. at 1415; *see* Michael Wells, *Punitive Damages for Constitutional Torts*, 56 La. L. Rev. 841, 866 (1996). If compensatory damages against a government entity provide deterrence, it is hard to see why punitive damages would not also deter.

Yet, while punitive damages should not be categorically unavailable, they are not appropriate in an ordinary case involving liability solely arising because of respondeat superior principles. Instead, liability should arise only where the unconstitutional conduct arises to willful and wanton misconduct. Where there is exposure to punitive damages, the potential unconstitutional actions will be "squarely on the radar screens of responsible officials." Myriam E. Gilles, *In Defense of Making Government Pay: The Deterrent Effect of Constitutional Tort Remedies*, 35 Ga. L. Rev. 845, 873 (2001). Thus, the reprehensive policies such as conducting body cavity searches on all misdemeanor female defendants arriving at the jail as in *Ciraolo* would be subject to an award of punitive damages.

In my view, maintaining the adequacy of remedies for state constitutional torts is the responsibility of this court. The legislature can establish reasonable processes for the prosecution of constitutional torts

but cannot substantively reduce the available remedies below a constitutionally acceptable point. *Godfrey*, 898 N.W.2d at 876–79 (plurality opinion). In the narrow class of cases mentioned above, I would insist on the availability of punitive damages against the municipality notwithstanding legislative action that seeks to limit the availability of the remedy.

Regretfully, the majority does not agree. But the majority's acceptance of the legislature's limitation on punitive damages against municipal entities for constitutional torts is, or at least in my view should be, dependent upon the availability of punitive damages in *Wilkes*-type actions. Although a *Wilkes*-type case imposing punitive damages upon individual actors is not before us, we must approach immunity issues in a systemic fashion. Otherwise, comparatively narrow applications of rights-restrictive doctrine may be palatable at each step but cumulatively create an unacceptable regime for state constitutional torts. This observation is consistent with the Supreme Court's approach in *City of Newport*, where the refusal to extend punitive damage liability to municipalities rested, at least in part, on the availability of punitive damages against an individual officer.

### V. Attorney Fees for Constitutional Torts Under Common Law Exceptions to the American Rule.

The last question is whether the plaintiff in this case might be entitled to attorney fees. There is no state statute authorizing attorney fees for successful prosecution of state constitutional torts. We have followed the American rule that attorney fees "are generally not recoverable as damages in the absence of a statute or a provision in a written contract." *Botsko v. Davenport Civil Rights Comm'n*, 774 N.W.2d 841, 845 (Iowa 2009) (quoting *Kent v. Emp't Appeal Bd.*, 498 N.W.2d 687, 689 (Iowa 1993) (per

curiam)). While the general rule is that attorney fees are not recoverable absent a statute or contractual provision, the question in this case is whether there are exceptions to the general rule that may be applicable.

The majority has concluded that attorney fees in this case may be awarded if the opposing party "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Hockenberg Equip. Co. v. Hockenberg's Equip. & Supply Co. of Des Moines, Inc.*, 510 N.W.2d 153, 158 (Iowa 1993) (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258–59, 95 S. Ct. 1612, 1622 (1975)). This common law exception to the general rule against award of attorney fees is well established and may well be applicable in this case depending upon the ultimate factual showing made at trial.

The plaintiff in this case, however, presents another reason for an award of attorney fees. The plaintiff asserts another common law exception to the general American rule, namely, that attorney fees and costs may be awarded under a "private attorney general" theory. The private attorney general theory as a basis for an award of attorney fees has been embraced in many states. *See, e.g., Arnold v. Ariz. Dep't of Health Servs.*, 775 P.2d 521, 537 (Ariz. 1989) (en banc); *Serrano v. Priest*, 569 P.2d 1303, 1315 (Cal. 1977) (en banc); *Sierra Club v. Dep't of Transp.*, 202 P.3d 1226, 1270 (Haw. 2009); *Hellar v. Cenarrusa*, 682 P.2d 524, 531 (Idaho 1984); *Bedard v. Town of Alexandria*, 992 A.2d 607, 611 (N.H. 2010); *Deras v. Myers*, 535 P.2d 541, 550 (Or. 1975) (en banc). *See generally* Ann K. Wooster, Annotation, *Private Attorney General Doctrine— State Cases*, 106 A.L.R.5th 523 (2003) (collecting cases). Although the private attorney general exception to the American rule was being embraced in lower federal courts, the Supreme Court put this development

to a full stop in federal courts in *Alyeska Pipeline*, 421 U.S. at 254–69, 95 S. Ct. at 1620–27.

The private attorney general theory is not a wide-open mechanism whereby any successful plaintiff can obtain attorney fees. Instead, it is a limited exception to the generally applicable American rule. In the seminal case of *Serrano*, the California Supreme Court held that attorney fees on a private attorney general theory could be awarded if (1) the litigation benefited a large number of people, (2) private enforcement of the rights involved was required, and (3) the issues have sufficient social importance. 569 P.2d at 1314. There are, of course, variations in the private attorney general doctrine from jurisdiction to jurisdiction. *See* William B. Rubenstein, *On What a "Private Attorney General" Is—And Why It Matters*, 57 Vand. L. Rev. 2129, 2142 (2004).

I would generally adopt the three-pronged test articulated in *Serrano* for determining whether attorney fees could shift based on a private attorney general theory in cases involving a state constitutional tort. In particular, it seems clear that in cases involving alleged search and seizure violations under the state constitution, the second and third criteria are likely met.

The only question is whether a substantial number of persons would benefit from the litigation. A significant benefit does not require a tangible asset or concrete gain but may arise simply from the effectuation of a fundamental constitutional or statutory policy. *Slayton v. Pomona Unified Sch. Dist.*, 207 Cal. Rptr. 705, 714 (Ct. App. 1984). On the other hand, an individual claim with little public benefit, such as that arising from a singular miscalculation of overtime benefit, is not sufficient. *State v. Boykin*, 538 P.2d 383, 388 (Ariz. 1975) (en banc); *see also City of Clarkston v. City of Clarkston Civil Serv. Comm'n—Fire*, No. 15119–1–III, 1997 WL

282501, at *5–6 (Wash. Ct. App. May 29, 1997) (addressing reinstatement of police chief).  As with the other issues, I would not engage in application of this test to the facts of this case.  I would only hold that attorney fees may be awarded under the private attorney general theory described above.  The majority opinion does not address the private attorney general question, and it thus remains an open issue.

**VI.  Conclusion.**

I would answer the certified questions as follows: the municipality is not entitled to good-faith immunity, punitive damages may be available against a municipality upon a proper showing, and attorney fees may be available under the bad faith or private attorney general theories.